**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JACK WILKINSON, individually and on behalf of all others similarly situated, | |
| Plaintiff, | C.A. No. 1:17-cv-11618 |
| v. | JURY TRIAL DEMANDED |
| SEVCON, INC., MATTHEW GOLDFARB, MATTHEW BOYLE, PAUL O. STUMP, DAVID R. A. STEADMAN, RYAN J. MORRIS, WALTER M. SCHENKER, WILLIAM KETELHUT, GLENN J. ANGIOLILLO, | |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

Plaintiff Jack Wilkinson ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this action on behalf of himself and the public stockholders of Sevcon, Inc. ("Sevcon" or the "Company") against Sevcon and Sevcon's Board of Directors (the "Board" or the "Individual Defendants," as further defined below, and together with the Company "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC")  Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.  Specifically, Defendants solicit shareholder votes in connection with an attempt to sell the Company to BorgWarner Inc. ("BorgWarner" or "Parent") through a proxy statement that omits material facts

necessary to make the statements therein not false or misleading. Unless these disclosure deficiencies are cured, the Company's stockholders will be forced to decide whether to vote their shares in favor of the Proposed Transaction (defined below) based upon a materially incomplete and misleading proxy statement.

2.      On July 17, 2017, Sevcon and Parent issued separate press releases announcing that they had entered into an Agreement and Plan of Merger dated July 14, 2017 (the "Merger Agreement"), under which Slade Merger Sub Inc. ("Merger Sub"), a wholly-owned subsidiary of Parent, would acquire all of Sevcon's outstanding common stock for $22.00 per share in cash and all of Sevcon's outstanding Series A Convertible Preferred Stock for a price per share equal to an as-converted basis of the common stock, together with any accrued and unpaid dividends (the "Merger Consideration"). The transaction between Sevcon and Parent (the "Proposed Transaction") has a total value of approximately $200 million.

3.      On August 8, 2017, Defendants issued materially incomplete and misleading disclosures in the Form PREM14A Preliminary Proxy Statement (the "Proxy") filed with the SEC in connection with the Proposed Transaction.

4.      The Proxy is deficient and misleading because, *inter alia*, it omits material information about the facts and circumstances that led up to the Proposed Transaction, as well as material information concerning the financial analyses conducted by Rothschild Inc. ("Rothschild"), the Company's financial advisor. Without all material information, Sevcon stockholders cannot make a properly informed decision regarding whether to vote in favor of the Proposed Transaction.

5.      By unanimously authorizing the issuance of the Proxy, the Individual Defendants participated in the solicitation even though they knew, or should have known, that the Proxy was materially false and/or misleading.

6.      The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder, as stockholders need such information in order to make a fully-informed decision in determining how to vote on the Proposed Transaction.  For these reasons, and as set forth in greater detail herein, Plaintiff seeks to enjoin the Defendants from conducting the stockholder vote on the Proposed Transaction unless and until the material information discussed below is disclosed to Sevcon's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of federal securities laws and regulations.   Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

8.      The Court has personal jurisdiction over each Defendant because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (a) Sevcon maintains its headquarters in this District; (b) the conduct at issue took place and had an effect in this District; (c) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

10. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Sevcon.

11. Sevcon is a corporation organized and existing under the laws of the State of Delaware. It maintains principle place of business at 155 Northboro Road, Southborough, Massachusetts 01772. Sevcon's common stock trades on NASDAQ under the ticker symbol "SEV."

12. Defendant Matthew Goldfarb ("Goldfarb") has served as a director of the Company since 2016 and as chairman of the board since December 2016.

13. Defendant Matthew Boyle ("Boyle") has served as president and chief executive officer ("CEO") and as a director of the Company since November 1997.

14. Defendant Paul O. Stump ("Stump") has served as a director of the Company since 2005.

15. Defendant David R. Steadman ("Steadman") has served as director of the Company since 1997 and served as chairman of the board from 2005 to 2013.

16. Defendant Ryan J. Morris ("Morris") has served as a director of the Company since 2013 and served as chairman of the board from July 2016 to December 2016.

17.     Defendant Walter M. Schenker ("Schenker") has served as a director of the Company since 2013 and served as chairman of the board from February 2016 to July 2016.

18.     Defendant William Ketelhut ("Ketelhut") has served as a director of the Company since 2011 and served as chairman of the board from January 2013 to December 2015.

19.     Defendant Glenn J. Angiolillo ("Angiolillo") has served as a director of the Company since 2013.

20.     Defendants Goldfarb, Boyle, Stump, Steadman, Morris, Schenker, Ketelhut, and Angiolillo are collectively referred to as "Individual Defendants" and/or the "Board."

21.     Relevant non-party BorgWarner is a Delaware corporation operating out of Auburn Hills, Michigan.

22.     Relevant non-party Merger Sub, a wholly-owned subsidiary of BorgWarner, is a corporation organized and existing under the laws of Delaware which was formed solely for the purpose of effectuating the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action individually and as a class action on behalf of all holders of Sevcon common stock who are being, and will be, harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendants.

24.     This action is properly maintainable as a class action under the Federal Rule of Civil Procedure 23.

25.     The Class is so numerous that joinder of all members is impracticable.  According to the Proxy, as of August 4, 2017, Sevcon had 6,293,927 shares of common stock outstanding.

While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in this Class. All members of the Class may be identified from records maintained by Sevcon or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

26.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: (i) whether Defendants solicited stockholder approval of the Proposed Transaction through a materially false or misleading Proxy in violation of federal securities laws; (ii) whether Plaintiff and other Class members will suffer irreparable harm if such securities laws violations are not remedied before the vote on the Proposed Transaction; and (iii) whether the Class is entitled to injunctive relief as a result of Defendants' wrongful conduct as alleged herein.

27.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.  Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

28.     Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

29.     The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

30.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

31.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

32.     Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## FURTHER SUBSTANTIVE ALLEGATIONS

*Company Background*

33.     Sevcon, through wholly-owned subsidiaries in Canada, China, England, France, Germany, Japan, South Korea, and United States, sells motor controllers for zero emission hybrid and electric vehicle.   The Company also, through a wholly-owned subsidiary in Italy, designs, manufactures and sells battery chargers for use in electric vehicles and power source systems for industrial, telecom, and medical applications.   In addition, Sevcon, through a separate subsidiary in the United Kingdom, manufactures and sells metalized film capacitors for use in power electronics, such as signaling and audio equipment.

*The Sale Process*

34.     On November 3, 2016, Defendant Boyle and representatives of Sevcon met with Martin Fischer ("Fischer"), vice president and general manager of BorgWarner Turbo Systems' Europe and South America Divisions, and Stefan Demmerle ("Demmerle"), the head of BorgWarner's power drivetrain systems division, to discuss potential commercial opportunities

involving Sevcon and BorgWarner.  During this meeting BorgWarner expressed an interest in a potential acquisition of Sevcon and Defendant Boyle responded that he would relay its interest to the Board.

35.     On November 4, 2016, Defendant Boyle called Defendant Goldfarb to discuss BorgWarner's interest and on November 6, 2016, Defendant Boyle informed the full Board of such interest.

36.     On November 8, 2016, at the Company's request, BorgWarner sent Defendant Boyle a draft nondisclosure agreement.

37.     On November 14, 2016, the Board met with representatives of Locke Lord LLP ("Locke Lord"), Sevcon's outside legal counsel, present and agreed they should form a special committee comprised of Defendant Goldfarb, Defendant Steadman, and Defendant Schenker to assist the board with assessing BorgWarner's interest as well as any other potential proposals to acquire the Company.

38.     On November 16, 2016, Defendant Boyle introduced Demmerle to Defendant Goldfarb.

39.     On November 19, 2016, the members of the proposed special committee met and discussed a potential transaction with BorgWarner as well as potentially engaging with a financial advisor to assist with the strategic review process.

40.     On November 22, 2016, the Board formed the Special Committee as proposed on November 14, 2016.

41.     On November 30, 2016, the Special Committee met to discuss the qualifications of two investment banks that might be well suited to assist in the strategic review process.

42.     On December 2, 2016, after negotiating the terms of the nondisclosure agreement, the Company and BorgWarner entered into the nondisclosure agreement.

43.     On December 5, 2016, the Nominating and Governance Committee determined to make Defendant Goldfarb chairman of the board, replacing Defendant Morris.

44.     On December 6, 2016, the Board met to discuss the status of communications with BorgWarner and the Special Committee met and determined to engage with Rothschild as financial advisor.  Later on this day, the Board also terminated Defendant Morris as chairman and replaced him with Defendant Goldfarb.

45.     On December 9, 2016, Rothschild and Sevcon entered into an engagement letter under which Rothschild would serve as financial advisor to the Special Committee and assist with reviewing a potential transaction with BorgWarner or another party.

46.     On December 19, 2016, Defendant Morris made certain demands to the Nominating and Governance Committee regarding board composition.  Later that same day, Defendant Morris, on behalf of Meson Capital, informed the Company of its intention to engage in a proxy contest regarding board composition at the upcoming annual meeting.

47.     On December 19, 2016, at the direction of the Special Committee, Defendant Boyle updated Demmerle with Sevcon's response to certain due diligence requests that had been made.

48.     On January 6, 2017, Party A, a financial sponsor, reached out to Defendant Boyle to express interest in a potential acquisition of Sevcon.  Defendant Boyle and Party A then agreed to meet to discuss this potential at a mutually convenient time.

49.     On January 12, 2017, Defendant Boyle and Defendant Goldfarb met with Demmerle and, Christopher Vance ("Vance"), BorgWarner's vice president of business development and M&A, and Tania Wingfield ("Wingfield"), BorgWarner's vice president of

product and manufacturing strategy of power drivetrain systems to discuss further BorgWarner's interest in acquiring the Company.

50.     Between mid-December 2016 and January 26, 2017, BorgWarner engaged in due diligence and preliminary discussions regarding a potential acquisition of Sevcon.

51.     Between mid-December and February 7, 2017, Sevcon was engaged in a proxy contest with Meson Capital involving the election of directors.  On January 26, 2017, Vance informed Defendant Goldfarb that BorgWarner would like to delay further discussions regarding the acquisition until after the proxy contest was resolved.  On February 13, 2017, the proxy contest was announced to have been resolved in favor of the incumbent Board and Defendant Goldfarb informed Vance as such.

52.     On March 2, 2017, Defendant Boyle received a written, preliminary proposal from Vance under which BorgWarner would acquire Sevcon for $19.00 per share in cash.  Such proposal also included a 60-day exclusivity agreement.

53.     On March 2, 2017, Party A and representatives of Sevcon met to discuss Party A's interest in a potential acquisition of the Company.

54.     On March 3 and March 6, 2017, the Special Committee met and determined that the offer price in BorgWarner's proposal was too low to agree to an exclusivity agreement.  On the same day, the Board met, agreed with the Special Committee, and determined that Rothschild should relay such decision to BorgWarner.  Following this determination, Defendant Goldfarb and Rothschild, in separate telephone calls, relayed this decision to Vance and BorgWarner's financial advisor, Deutsche Bank, respectively.

55.    On March 8, 2017, Vance delivered a revised written proposal increasing the offered purchase price per share from $19.00 to $21.00 per share and reducing the requested exclusivity period from 60 days to 45 days.

56.    In addition, on March 8, 2017, Sevcon was contacted by an investment banker claiming to represent Party B, a strategic party, and informed of Party B's interest in potentially acquiring the Company.

57.    On March 9, 2017, the Board met and determined to instruct Rothschild to reach out to six parties to gauge their interest in acquiring Sevcon and instructed Defendant Boyle to reach out to Party C, whom Rothschild indicated would likely be in the best position to offer a competitive price to acquire Sevcon, as well as the purported representative of Party B to discuss a potential acquisition.  Later that same day, Defendant Boyle reached out to the investment banker claiming to be a representative of Party B.

58.    On March 10, 2016, Rothschild reached out to the previously identified six parties, including two strategic parties, Party D and Party E.

59.    On March 12, 2017, the Special Committee met with Locke Lord and Rothschild and discussed how only preliminary expressions of interest had been received from other parties contacted in comparison to the more developed proposal from BorgWarner.  Regardless, the Special Committee directed Rothschild to inform BorgWarner that they would not be willing to provide an exclusivity at $21.00 per share.  Later that same day Defendant Goldfarb called Vance to inform him of Sevcon's reluctance to enter into an exclusivity agreement.

60.    Also on March 12, 2017, Defendant Boyle reached out to Party C to determine if they would be interested in a potential acquisition of Sevcon and Party C responded that it did not have an interest in pursuing such an acquisition at that time.

61.     On March 13, 2017, Rothschild informed Deutsche Bank of the Special Committee's decision regarding the $21.00 offer price and their lack of interest in entering into an exclusivity agreement.

62.     Also on March 13, 2017, Defendant Boyle was contacted by Party B indicating their interest in potentially acquiring Sevcon.  Subsequently, Party B and the Company entered into a nondisclosure agreement; however, Party B soon after informed Defendant Boyle that it was no longer interested in pursuing a potential acquisition of the Company.

63.     On March 21, 2017, Rothschild received a letter from Party D expressing an interest in a potential acquisition of Sevcon.

64.     On March 22, 2017, the Special Committee met and determined that due to the lower levels of interest expressed by other Parties to date in comparison to Borg Warner's interest, Sevcon management and Rothschild should focus on getting BorgWarner to improve the terms of its proposal.

65.     As of March 22, 2017, in addition to contacts received from Party A and Party B, Rothschild had communicated with seven potentially interested parties, including Party C, Party D, and Party E.  The other four Parties had not contacted Rothschild or Company management following the initial outreach.

66.     On March 27, 2017, Defendant Goldfarb and Defendant Boyle received a written indication of interest from Party A to potentially acquire Sevcon for $15.50 in cash per share.

67.     On March 29, 2017, Rothschild was contacted by Party E expressing interest in a potential acquisition of Sevcon.

68.     On April 1, 2017, the Special Committee met and again determined that due to the level of interest parties had expressed, including Party A, Party D, and Party E, in comparison with BorgWarner's, Sevcon should continue to focus on improving BorgWarner's offer.

69.     Later on April 1, 2017, the Board met and discussed the status of interest received to date from various parties.

70.     On April 3, 2017, the Special Committee engaged Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to assist as a legal advisor and provide advice concerning a potential acquisition of Sevcon.

71.     Also on April 3, 2017, Vance raised the possibility to Defendant Goldfarb that BorgWarner might lower its offer price to $19.00 unless the Company agreed to a period of exclusivity.  Later that same day, the Special Committee met to discuss this conversation and determined to inform BorgWarner that Sevcon would not enter into an exclusivity period at a price of $21.00, but that the Board would consider doing so at a higher price and the inclusion of a "go shop" period in the merger agreement, were the transaction to proceed.

72.     On April 4, 2017, Defendant Goldfarb relayed the Special Committee's decision to Vance.  Vance, on behalf of BorgWarner, agreed to increase their offer price to $22.00 per share and subsequently provided Sevcon with an exclusivity agreement containing a 30-day exclusivity period.

73.     From April 4, 2017 to April 6, 2017, Skadden met with Sidley Austin LLP ("Sidley"), BorgWarner's legal counsel, to discuss a potential exclusivity agreement.

74.     On April 5, 2017, Deutsche Bank informed Rothschild that BorgWarner would not continue negotiations for $22.00 per share without an exclusivity period.

75.     On April 6, 2017, the Special Committee met and discussed BorgWarner's updated proposal.

76.     On April 11, 2017, the Special Committee approved the exclusivity agreement and Sevcon and BorgWarner executed the agreement.  The exclusivity agreement provided for a 30-day exclusivity period and did not provide for a "go shop" period to be included in the merger agreement.

77.     During the following weeks, BorgWarner informed Sevcon that it would require the Company to buy out its Chinese joint venture partner prior to the execution of the merger agreement.  The Special Committee met and discussed this requirement on April 28, 2017.

78.      On May 2, 2017, Skadden received a draft merger agreement from Sidley.

79.     On May 5, 2017, the Board met with Skadden, Lock Lord, and Rothschild and discussed BorgWarner's requirement that Sevcon buy out its Chinese joint venture partner. Defendant Boyle stated to the Board that in his view Sevcon should buy out the Chinese joint venture partner regardless of BorgWarner as the Company had outgrown the utility of the relationship.  The Board then determined to begin negotiations to buy out its Chinese joint venture partner.

80.     On May 11, 2017, Sevcon and the Special Committee agreed to extent the exclusivity period with BorgWarner to May 25, 2017.  Following this new expiration, Sevcon then agreed to multiple one-week extensions to the exclusivity period until July 14, 2017, when the merger agreement was executed.

81.     On May 17, 2017, the Special Committee met and reviewed the status of the draft merger agreement with Skadden, Lock Lorde, and Rothschild.

82.     On May 19, 2017, Skadden sent Sidley a revised draft merger agreement.

83.     On May 26, 2017, the Special Committee and the Board held meetings and the Board approved Sevcon's buying out of the Chinese joint venture partner.

84.     On May 27, 2017, Vance informed Defendant Goldfarb that the execution of a definitive agreement to buy out the Chinese joint venture partner was insufficient and that BorgWarner required the buy out to close before the execution of the merger agreement to acquire the Company.

85.     On May 28, 2017, the Board met to discuss BorgWarner's requirement and determined to request additional deal protections in order to proceed with exclusivity on a week-by-week basis, so as to allow Sevcon to respond to offers should they materialize.

86.     On June 3, 2017, Sevcon executed an equity transfer agreement with its Chinese joint venture partner to complete the buyout. The negotiations for the buyout resulted in Sevcon paying a higher than expected purchase price to buyout the Chinese joint venture partner.

87.     On June 6, 2017, Party A contacted Defendant Goldfarb to discuss its prior indication of interest and Defendant Goldfarb informed it that Sevcon was not in a position to respond at that time.

88.     On June 8, 2017, Skadden received a revised draft merger agreement from Sidley.

89.     On June 12, 2017, the Special Committee met to discuss the drafts of the merger agreement.

90.      From June 13, 2017 through July 14, 2017, Skadden and Sidley continued to negotiate the terms of the draft merger agreement.

91.     On June 22, 2017 and June 23, 2017, Defendant Goldfarb and Defendant Boyle met with BorgWarner, Vance, Skadden and Sidley to negotiate terms further.  The parties agreed to

various terms, including a requirement that voting and support agreements be executed by Meson Capital, Bassi, and Sevcon's directors and director emeritus.

92.     On June 25, 2017, Party E contacted Rothschild regarding its continued interest in a potential acquisition of Sevcon.  Due to the exclusivity and the advanced stage of negotiations with BorgWarner, at the direction of the Special Committee, Rothschild did not engage further with Party E.

93.     On June 27, Party A contacted Defendant Goldfarb regarding its continued interest in a potential acquisition of Sevcon.  Due to the same reasons behind the decision not to engage in further conversations with Party E, the Special Committee instructed Defendant Goldfarb to not engage further with Party A.

94.     On July 13, 2017, Sevcon's buyout of its Chinese joint venture partner was closed.

95.     On July 14, 2017, Rothschild delivered its fairness opinion with respect to the Proposed Transaction and the Board unanimously approved the merger agreement.  Following such approval, the merger agreement was executed by Sevcon, BorgWarner and Merger Sub.

96.     On July 17, 2017, Sevcon and BorgWarner issued separate press releases announcing the agreement.  Sevcon's press release, in relevant part stated:

> SOUTHBOROUGH, Mass., July 17, 2017 (GLOBE NEWSWIRE) -- Sevcon, Inc. ("Sevcon" or the "Company") (Nasdaq:SEV), a world leader in the design and manufacture of controls and battery chargers for zero emission electric and hybrid vehicles, today announced that it has entered into a definitive merger agreement with BorgWarner Inc. that provides for BorgWarner to acquire all of the outstanding shares of Sevcon's common stock for $22.00 per share in cash and all of the outstanding shares of Sevcon's Series A Convertible Preferred Stock for a price per share on an as-converted basis equal to the common stock, together with payment of any accrued and unpaid dividends.  The total transaction value, including the assumption of indebtedness, is expected to be approximately $200 million at the closing of the transaction.
>
> The transaction price of $22.00 per share represents a 61% premium to the closing sale price of common stock of the Company on Friday, July 14, 2017 and a 64%

premium to the 30-day volume weighted average price of common stock of the Company.

"The proposed merger with BorgWarner provides substantial value to our stockholders and the chance for Sevcon to maximize previous growth investments and capitalize on greater opportunities as a part of a much larger organization with significant market presence," said Sevcon President and CEO Matt Boyle.

The Sevcon Board of Directors has unanimously approved the merger agreement and has recommended approval of the merger by Sevcon's stockholders. The transaction is expected to close in the fourth calendar quarter of 2017 and is contingent on the approval of Sevcon's stockholders, and is subject to the satisfaction or waiver of certain other closing conditions. The transaction is not subject to a financing condition.

Rothschild Inc. is acting as financial advisor to Sevcon, with Skadden, Arps, Slate, Meagher & Flom LLP and Locke Lord LLP acting as legal advisors.

97.     BorgWarner's press release on the Proposed Transaction, in relevant part stated:

Auburn Hills, Michigan, July 17, 2017 – BorgWarner announced today that it has entered into a definitive agreement to acquire Sevcon, Inc., a global player in electrification technologies. Sevcon complements BorgWarner's power electronics capabilities utilized to provide electrified propulsion solutions.

"This acquisition supports our existing strategy to supply leading technology for all types of propulsion systems; combustion, hybrid and electric," said James Verrier, President and CEO of BorgWarner. "We look forward to welcoming Sevcon's talented employees to BorgWarner."

The completion of the transaction is subject to certain terms and conditions, including the approval of Sevcon's stockholders and receipt of required competition law approval.  The expected enterprise value of the transaction at closing is approximately $200 million. The transaction is expected to close in the fourth quarter of 2017 subject to the satisfaction of closing conditions.

### *The Proxy Misleads Sevcon Stockholders by Omitting Material Information*

98.     On August 8, 2017, Sevcon filed a materially misleading Proxy with the SEC.  The

Proxy is rendered materially misleading by the omission of critical information concerning: (i) the

process that led up to the execution of the Merger Agreement, including the solicitation and offer

review process; (ii) whether a nondisclosure agreement Party B entered into is restricting them it

from coming forward with a topping bid; (iii) potential conflicts of interest faced by Sevcon senior

management and/or directors when leading the search for strategic alternatives that ultimately resulted in the execution of the Merger Agreement; (iv) information regarding potential conflicts of interest concerning Rothschild; and (iv) Rothschild's financial analyses conducted in preparing its fairness opinion.

99.     As such, the Proxy, which recommends that the Company's stockholders vote their shares in favor of the Proposed Transaction, misrepresents and/or omits material information in violation of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

### *Misleading Statements and Omissions Regarding the Sale Process*

100.     The Proxy discloses an offer from Party A, which had been received early on in the sale process, for $15.50 in cash per share.  While this offer is disclosed, there is no indication that any of Sevcon's representatives ever responded to Party A that this offer was insufficient and/or attempted to negotiate with Party A at all.  This is particularly concerning as this offer was received in advance of Sevcon entering into an exclusivity agreement with BorgWarner.  In addition, the Proxy states that Party A reached out to Defendant Goldfarb twice during the period in which Sevcon was continuously entering into week-by-week extensions to the exclusivity agreement with BorgWarner (which eventually extended the exclusivity period from 30-days to over 90-days). While the Proxy indicates that Defendant Goldfarb declined to engage with Party A on June 27, 2017 at the direction of the Special Committee, the Proxy does not indicate on what basis Defendant Goldfarb also declined to engage with Party A following its earlier outreach on June 6, 2017 (when the Board may well have considered refraining from another week long extension of the exclusivity agreement in favor of negotiating with Party A).

101.     In addition, the Proxy appears to indicate that Party A was not taken seriously throughout the sale process.  For example, the Proxy states that Party A first expressed interest in

a potential acquisition on January 6, 2017 yet Sevcon did not meet with Party A regarding such interest until March 2, 2017.  In contrast, on November 4, 2016, BorgWarner expressed interest in a potential acquisition to Defendant Boyle, on November 6, 2016, the Board decided to form a special committee to address the interest, and on November 8, 2016, Sevcon requested a draft non-disclosure agreement from BorgWarner.  By December 5, 2016, the non-disclosure agreement had already been executed and BorgWarner had begun requesting due diligence items.  There is no indication that Party A even had the opportunity to enter into a non-disclosure agreement or was ever provided an opportunity to conduct due diligence, despite their continued interest in a potential acquisition of Sevcon.  Given the apparent favoring of BorgWarner, the Proxy should disclose Sevcon's basis for declining to negotiate with Party A as well as whether Defendant Goldfarb acted unilaterally in declining to respond to Party A's continued interest.

102.    The foregoing information is particularly material, because without it stockholders will be unable to determine not only whether there were and may still be other potential strategic or financial partners that would be willing to provide greater consideration than that offered by the Proposed Transaction, but also whether the search for potential strategic partners was fairly conducted.

### *Misleading Statements and Omissions Regarding the Non-Disclosure Agreements*

103.    The Proxy discloses that Sevcon entered into a non-disclosure agreement with Party B.  However, the Proxy fails to disclose whether this agreement contained a standstill provision, and if it did, the terms of such standstill provision.  In particular, the Proxy is silent as to whether the non-disclosure agreement with Party B that Sevcon entered into is currently operating to restrain Party B from making a superior offer or topping bid for the Company, and/or if it contained don't-ask-don't-waive provisions or other terms that contractually prohibit Party B from seeking

a waiver of any standstill provision terms.  Without this information, the Company's stockholders are being misled to believe that all counterparties, including Party B, have been and are currently free to make a superior offer to acquire the Company.

### *Potential Conflicts Facing Company Management and Directors*

104.    The Proxy is actively misleading regarding employment discussions taking place during the period leading up to the execution of the Merger Agreement.

105.    The Proxy states that "[p]rior to or following the closing, our executive officers may discuss or enter into agreements with Parent its affiliates regarding employment . . .." However, the Proxy fails to disclose definitively whether any discussions/negotiations regarding management's continued employment have taken place as of the date of the Proxy between Sevcon executives and BorgWarner and/or its affiliates.  Given that the Merger Agreement provides for continued employment of Sevcon's employees, it is a near certainty that such discussions have occurred and as such, they should be disclosed.

106.    The foregoing statement relating to the continued employment of Sevcon's executive employees is at best misleading, as there is no information as to the content, nature, timing nor parties involved in discussions that led to their continued employment pursuant to the Merger Agreement.  Moreover, contrary to the disclosure in the Proxy, the continuing employment of Sevcon management after the close of the Proposed Transaction appears to be a foregone conclusion.  In the press release announcing the Proposed Transaction, Defendant Boyle, Sevcon's president, CEO and a member of the Board, stated that the Proposed Transaction would provide "[t]he chance for Sevcon to maximize its previous growth investments and capitalize on greater opportunities as part of a much larger organization . . .."  Similarly, in BorgWarner's press release

announcing the Proposed Transaction, James Verrier, BorgWarner's President and CEO, stated, "[w]e look forward to welcoming Sevcon's talented employees to BorgWarner."

107.    Despite these explicit and clear public statements by Defendant Boyle and James Verrier, the Proxy actively misleads Sevcon stockholders into believing that **no discussions** regarding continued employment of management took place.  While formal agreements on this issue may not have been reached, it is clear that some communications took place.

108.    This information is particularly material with respect to Defendant Boyle and Defendant Goldfarb, as they were instrumentally involved in the negotiations with BorgWarner throughout the sale process.  For example, as referenced above, BorgWarner initially contacted Defendant Boyle regarding a potential acquisition of Sevcon and he subsequently brought the potential transaction to the Board.  Similarly, Defendant Goldfarb was involved throughout the negotiation process and is even slated to receive an additional $100,000 at the close of the Proposed Transaction for all of his extra effort.  Any communications – even one-sided written indications in proposals or other written communications – concerning post-merger employment between BorgWarner or its affiliates and Defendant Boyle, Defendant Goldfarb, or any other Sevcon officers, directors, or employees, during the sale process, would be material to a stockholder's decision as to whether to vote in favor of the Proposed Transaction.  Such communications give rise to substantial undisclosed conflicts of interests.

109.    Statements that "our executive officers may discuss or enter into agreements" are rendered materially misleading by the omission of material facts regarding the timing and nature of employment communications and negotiations, which undoubtedly occurred.

110.    The failure to disclose the content and timing of such discussions materially misleads Sevcon stockholders as to the potential conflicts of interest faced by Company

management and the Board in supporting the merger. The omitted information relating to the timing, content, and parties involved in these communications concerning the retention of Sevcon's management and directors would significantly alter the total mix of information that Defendants have disclosed to solicit stockholder approval of the Proposed Transaction. The conflicts of interests created and fostered by such communications would affect the stockholders' perception and analysis of the entire process and the ultimate fairness of the Proposed Transaction. Thus the statements in the Proxy are rendered materially misleading by these omissions.

### *Potential Conflicts Concerning Rothschild*

111.    With respect to Rothschild, the Proxy also fails to disclose potential conflicts of interest that may be facing Rothschild as a result of compensation it may have received from BorgWarner and/or its affiliates in the two years prior to the execution of the Merger Agreement. Specifically, the Proxy states that "[r]epresentatives of Rothschild disclosed a past financial advisory engagement with BorgWarner and stated that Rothschild did not receive any fee for such engagement."  However, the Proxy then later states that "[i]n the past Rothschild has provided certain financial advisory services to Parent."  Firstly, if Rothschild did not receive a fee for the disclosed engagement, the Proxy must disclose what Rothschild did receive for such work. Secondly, the above statements appear to be in direct conflict as the first indicates there was one engagement and the second indicates that there may have been multiple engagements as Rothschild provided "financial advisory services."  This is especially material, considering that Rothschild's potential receipt of additional fees from BorgWarner and/or its affiliates on other transactions may have improperly influenced the rendering of its fairness opinion with respect to the Proposed Transaction.   In other words, such information would be material to stockholders when determining how much credibility, if any, Rothschild's fairness opinion should be afforded.

*Misleading Statement and Omissions Regarding Rothschild's Financial Analysis*

112.     The Proxy describes Rothschild's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Rothschild's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Sevcon's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Rothschild's fairness opinion in determining whether or not to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Sevcon's stockholders.

113.     With respect to Rothschild's *Illustrative Discounted Cash Flow Analysis*, the Proxy fails to disclose (i) unlevered, after-tax free cash flow as calculated by Rothschild for Sevcon over fourth quarter 2017 and for the fiscal years 2018 through 2022; (ii) the terminal value of Sevcon; (iii) the inputs and assumptions underlying Rothschild's use of illustrative after-tax discount rates of 14.00% to 16.00%; (iv) the basis for using perpetuity growth rates of 3.0% to 5.0%; (v) Sevcon's estimated amount of net debt; and (vi) the number of fully diluted shares of common stock of Sevcon outstanding as provided by Company management.

114.     With respect to Rothschild's *Selected Public Companies Analysis*, the Proxy fails to disclose the individual multiples and financial metrics for the companies observed by Rothschild in its analysis.  The disclosure of such multiples is necessary because they are a crucial element of these analyses, as the analysis is based on comparison and relative valuation.  Without such disclosure, stockholders are unable to determine whether the range of multiples selected by Rothschild reflects appropriately comparable transactions to the Proposed Transaction.  Failure to

disclose this information renders the statements in the Proxy made by Rothschild pertaining to the fairness of the Proposed Transaction misleading.

115.    With respect to Rothschild's *Analysis of Selected Transactions*, the Proxy states that the financial analyses that the Special Committee reviewed on July 14, 2017 contained incorrect multiples relating to the acquisition of Haldex which also made the average and median multiples for EV/LTM/EBITA Ratio and EV/LTM EBIT Ratio incorrect, as well as the median of EV/LTM Sales Ratio.  However, the Proxy fails to disclose whether the Special Committee and/or the Board ever received the correct calculations prior to approving the Merger Agreement.  Rather, the Proxy simply states that Rothschild determined such errors were not material to its opinion; however, this does not clarify whether such errors would have been material to the Board and/or the Special Committee.

116.    With respect to Rothschild's analysis of the future price per share of Sevcon's common stock, the Proxy fails to disclose: (i) the basis for applying illustrative EV/EBIT multiples ranging from 12.0x to 15.0x to estimated EBIT of Sevcon; (ii) Sevcon's estimated net debt; (iii) the number of fully diluted shares of Sevcon common stock outstanding as provided by Company management; and (iv) the inputs and assumptions underlying the discount rate of 17.0%.

117.    With respect to Rothschild's *Other Factors* section, the Proxy indicates that Rothschild conducted a premiums paid analysis of selected precedent transactions, but fails to disclose the number of transactions analyzed, the corresponding premiums of such transactions, nor the high and low premiums observed by Rothschild.

118.    Without the foregoing omitted information, the Company's stockholders are being misled as to the reliability of and basis for Rothschild's fairness opinion.

## CLAIMS FOR RELIEF

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act, and SEC Rule 14a-9 Promulgated Thereunder, Against the Individual Defendants and Sevcon**

119.   Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

120.   The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Sevcon is liable as the issuer of these statements.

121.   The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

122.   The omissions and misstatements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

123.   The Individual Defendants were aware of their duty to disclose this information, and yet omitted such at least recklessly or negligently.  The material information described above that was omitted from the Proxy takes on actual significance in the minds of Sevcon's stockholders in reaching their decision whether to vote in favor of the Proposed Transaction.  Absent disclosure of this material information prior to the vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision about whether to vote in favor

of the Proposed Transaction and are thus threatened with irreparable harm for which damages are not an adequate remedy.

124.    The Proxy is an essential link in causing Plaintiff and the Company's stockholders to approve the Proposed Transaction.

125.    By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

126.    Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

127.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

128.    The Individual Defendants acted as controlling persons of Sevcon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Sevcon and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

129.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

130.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.   They were thus directly involved in the making of the Proxy.

131.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

132.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, Plaintiff and the Class are threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.      Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

F.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: August 28, 2017                              Respectfully submitted,

                                                    **MATORIN LAW OFFICE, LLC**

                                                    */s/ Mitchell J. Matorin*
                                                    Mitchell J. Matorin (BBO# 649304)
                                                    18 Grove Street, Suite 5
                                                    Wellesley, MA 02482
                                                    (781) 453-0100
                                                    mmatorin@matorinlaw.com

**OF COUNSEL:**

**LEVI & KORSINSKY LLP.**                           *Attorneys for Plaintiff*
Donald J. Enright
Elizabeth K. Tripodi
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567